[Cite as *State v. Hawkey*, 2016-Ohio-5369.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### DEFIANCE COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,              CASE NO. 4-14-03

    v.

JUDITH I. HAWKEY,                   **J U D G M E N T**
                                                 **E N T R Y**

    DEFENDANT-APPELLANT.

{¶1} This cause comes on for determination of Appellee's application for reconsideration and clarification of this Court's opinion and final judgment, pursuant to App.R. 26(A)(1); and Appellee's motion to certify a conflict, pursuant to App.R. 25. Appellant did not file a response to either the application or motion.

{¶2} The Appellee, State of Ohio, seeks reconsideration and clarification of our opinion in *State v. Hawkey*, 3d Dist. Defiance No. 4-14-03, 2016-Ohio-1292. A request for reconsideration will only be granted if the application sets forth obvious errors in the decision or raises an issue that was not properly considered in the first instance. See *Columbus v. Hodge,* 37 Ohio App.3d 68, 523 N.E.2d 515 (10th Dist. 1987). "An application for reconsideration is not designed for use in instances where a party simply disagrees with the conclusions reached and the logic used by an appellate court." *State v. Owens*, 112 Ohio App.3d 334, 336, 678 N.E.2d 956

(11th Dist. 1997). This request raised eight issues that the State would like addressed. For the reasons stated below, the application for reconsideration should be denied. However, we will provide clarification to resolve any confusion that the State claims to have.

{¶3} First, the State alleges that this court erred in its discussion of the Daubert Motion as it applies to Dr. Knox's testimony. The State is correct that the prior opinion mistakenly stated that "No ruling was made on the motion prior to trial." *Hawkey* at ¶ 3. The trial court orally ruled on the motion at the end of the hearing. The opinion should state that no journal entry of the ruling was placed on the record prior to trial. However, this error had no effect on the reasoning of this court in reaching its conclusion as it was understood that the trial court had found Knox's testimony acceptable by the fact that she was allowed to testify to her diagnosis of "child torture". Thus it is not grounds for reconsideration.

{¶4} The State then argues that this court erred in determining that the trial court erred in allowing the testimony of Dr. Knox regarding "child torture as a form of child abuse." Initially, this court notes that the argument raised by the State is no different than what was addressed in both the trial court during the Daubert hearing and on appeal and has thus already been considered by this court. The motion for reconsideration raises no new issue for consideration and does not point out an obvious error on this issue, but merely expresses a difference of opinion and thus

cannot be granted on this issue. However, this court will provide clarification on the issue for the State.

{¶5} This court has previously addressed what is required for an expert's opinion to be admissible in *State v. Ream*, 3d Dist. Allen No. 1-12-39, 2013-Ohio-4319. In *Ream*, this court addressed that for a trial court to determine "whether the opinion of an expert witness is reliable under Evid.R. 702(C), a trial court, acting as a gatekeeper, examines whether the expert's conclusion is based on scientifically valid principles and methods." *Id.* at ¶ 81. "In evaluating the reliability of scientific evidence, several factors are to be considered: (1) whether the theory or technique has been tested, (2) whether it has been subject to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance." *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 1998-Ohio-178, 687 N.E.2d 735. The focus of the evaluation is on the principles and methodology, not the conclusions generated. *Id.* "Scientific evidence is not admissible under Evid.R. 702 unless the proponent of the evidence lays a proper foundation by presenting adequate expert testimony concerning the reliability of the specific procedures used and the underlying scientific principles or theories." *State v. Robinson*, 160 Ohio App.3d 802, 2005-Ohio-2280, ¶ 31. This court, in *Ream*, held that the proponent has to present evidence on the relevant factors that the trial court is to consider. *Ream, supra* at 85-86.

{¶6} In this case, Knox testified at the Daubert hearing that she had been accepted as an expert witness in the field of child abuse pediatrics. Hearing Tr. 10. When questioned about her theory of "child torture" as a diagnosis, she testified that the definition was based upon the cases she had studied. *Id*. at 68. She and her co-authors had submitted a manuscript for publication and she believed it would be published after minor changes were made, but at that time, it had not been published. *Id*. As to methodology, Knox testified that they created the diagnosis in the following manner.

> **We systematically created this definition. We systematically developed and defined this in the medical literature after conducting this research study to look at what constitutes this. What are inclusion criteria for this. We studied twenty-eight separate cases and we looked at multiple different factors that were part of this study to develop inclusion criteria for a formal medical definition.**
>
> **Okay. So you and your authors created this definition?**
>
> **Correct.**

*Id*. at 68-69. Knox further testified that her study was a multi-national study in which "several different child abuse pediatricians across the country" participated. *Id*. at 101. Additionally, an attorney helped write the manuscript which was submitted for publication. *Id*. The purpose of the manuscript was to create a definition of child torture as a form of abuse. *Id*. at 102. However, Knox admitted that there was no formal medical definition of "child torture", it was a diagnosis she was trying to create and have accepted. *Id*. at 103. Knox also admitted that while

there have been prior medical definitions of "child torture" none of them had been widely accepted by the medical community. *Id*. at 104. The purpose of the study was "to look at how we can create this [definition of child torture] to be widely accepted by the medical community." *Id*.

{¶7} The trial court was required to view Knox's diagnosis of "child torture" using the factors set forth in *Miller*. This court recognizes that there was no way to test the theory of "child torture" in that it is a new diagnosis that will either be accepted or not be accepted. The only way to determine if abuse is "child torture" rather than child abuse would be a subjective determination based upon individual facts in each situation. Thus, this factor is not applicable in this instance. The second factor was whether the theory had been subject to peer review. While Knox testified that it had been reviewed by the Journal of Child and Adolescent Trauma, and she expected it would be published by the end of 2012, at the time of the hearing, no publication had yet occurred. Thus, there had been very little instances for peer review of the diagnosis that Knox was creating. As to the third factor, there was no known or potential rate of error discussed. Knox testified that they excluded some cases from her study because they involved additional factors than what she was studying and that her study was based on review of 28 cases. She did not testify to how known or potential errors could be identified or avoided. Finally, Knox testified that although others had attempted to create a diagnosis of "child torture" previously, it had not gained general acceptance. As her study had yet to be

published, no evidence was provided to the trial court for it to determine that her study would be generally accepted. Reviewing these factors, only two of them are applicable to the theory of "child torture" to which Knox wished to testify – whether it had been subject to peer review and whether it had gained general acceptance. Neither of these factors work in favor of Knox as the evidence shows no acceptance and Knox's creation had yet to be published. Thus, the testimony concerning "child torture" as a diagnosis would not be reliable under Evid.R. 702(C), and should have been excluded. The State also argues that use of the term "child torture" is acceptable because it has been used in other cases. However, those cases did not involve a diagnosis of "child torture". This does not mean that Knox could not have testified as an expert as to child abuse. Just that she could not diagnose Corey as a victim of "child torture" when such a diagnosis was one she had created and by her own testimony was not widely accepted by the medical community. In addition, it does not mean that upon retrial a new hearing could not be held and the factors reconsidered by the trial court in light of new circumstances which may have arisen since the first hearing in 2013.

{¶8} The second argument of the State is that this court should reconsider that the State had no intention of calling Corey to testify after Dr. Salter's testimony and that the State had rested its case. A review of the record indicates the following dialogue occurred between the trial court and the State after the testimony of Salter.

-6-

> **The Court: Before we excuse you [the jury], does the State have further witnesses to present?**
>
> **Mr. Murray: I don't believe so, Your Honor. We do have some legal matters to pick up with the Court.**
>
> **\* \* \***
>
> **The Court: Be seated. Ladies and Gentlemen of the jury, the State has indicated they are through with witnesses they have called at this stage of the case.**
>
> **Mr. Mertz, Mr. Crates, witnesses to present?**

Tr. 1623-24. This indicates that the State had no more witnesses to present and Corey had not testified at that time. The next morning the trial court and the attorneys had the following discussion.

> **The Court: We're on the record, out of presence of the jury. Defendant and counsel are present.**
>
> **And Mr. Murray, the State has rested and we're addressing the issue of your exhibits?**
>
> **Mr. Murray: Yes, Your Honor. Pursuant to our consent and stipulation yesterday, the State tentatively rested on – with the understanding that we would request admission of certain exhibits.**
>
> **The Court: All right.**
>
> **Mr. Murray: And that [sic] where we're at.**

Tr. 1710. A long discussion was then held about the admissibility of the exhibits. The state indicated that it had never indicated that Corey was going to testify during the trial and the trial court also indicated that such a representation was not made.

-7-

Tr. 1734-35. After a break, the State then asked the court permission to present additional evidence. Tr. 1743-44.

> **The Court: So bottom line is you're willing to concede the inadmissibility of the statements, but you want to reopen your case for the opportunity to call Corey as a witness.**
>
> **Mr. Murray: I think that's a yes, Your Honor.**

Tr. 1745. Although the State did not concede that it had rested its case, the trial court saw it as such and proceeded as if that was the case. The State is correct in claiming that at no time did the prosecutor say the words "the State rests", however the use of these exact words is not necessary.

{¶9} Regardless, this issue is irrelevant because this court did not rule on whether the State had rested its case or whether it should have been allowed to reopen its case. Although Hawkey raised it as an assignment of error, this court did not address the issue because it was moot in light of our decisions regarding the other assignments of error. *Hawkey, supra* at ¶ 85. As to whether the State intended to call Corey, the record, as addressed above, shows that the State informed the trial court that it had no more witnesses after Salter's testimony. Additionally, during the long discussion between defense counsel and the court regarding the admission of the State's exhibits, defense counsel was displeased with the fact that the State had not called Corey and complained that the State had seemed to indicate they would be doing so. The trial court then noted that the State had never indicated it was going to do so. At no time did the State interject and make any statement

contradicting the defense counsel or the trial court to indicate they planned to have Corey testify. It was not until after the issue about the admissibility of the exhibits was raised that the State asked to present the testimony of Corey. The State suggests that this Court mischaracterized what happened. A second review of the record does not show that there was a mischaracterization or that "the State's case was viewed unfairly". Additionally, the testimony of Corey was considered by this court. Therefore, there is no new issue raised and no obvious error that would support reconsideration.

{¶10} The third claim by the State is that this court erred when it excluded Dr. Okuley's testimony. This court initially notes that the testimony was not excluded and was not an issue on appeal. The State claims we mischaracterized the evidence by stating that "On cross-examination, Okuley admitted that he changed the certificate at the request of the prosecutor and solely based on the new statements made by Corey, even though he had not spoken with Corey." *Id.* at ¶12. The testimony was as follows.

> **Q. Okay. And did you ever personally speak with Corey Breininger as it came to matters relating to your investigation in changing this death certificate?**
>
> **A. No.**
>
> **Q. All right. And at whose request did you issue a new death certificate changing this to homicide?**
>
> **A. The prosecutor, Mr. Murray, asked me to look in on this case.**

Tr. 542. The argument made by the State in its motion was addressed by the beginning of the paragraph.

> **After reviewing the crime scene photos, reading the reports, reading the most recent statements made by Corey, and speaking with the former coroner, he changed the manner of death from accidental to homicide.**

*Hawkey, supra* at ¶ 12. The statement to which the State objects came from the testimony on cross-examination, was not an issue in this case, had no effect on the outcome of the appeal, and when taken in context was not a mischaracterization. It is clear that Okuley was not randomly reviewing files from cases almost 10 years old, but reviewed this one at the request of the prosecutor. Then based upon his review of the file and the recent statements of Corey, he changed the manner of death. This is not a mischaracterization as to what happened and there is nothing to reconsider.

{¶11} The fourth objection raised by the State was to the exclusion of the testimony of Salter. The decision to admit challenged hearsay is reviewed de novo under the applicable hearsay rule, rather than the more deferential abuse of discretion standard. *State v. Sorrels*, 71 Ohio App.3d 162, 593 N.E.2d 313 (1st Dist. 1991). This court initially notes that we did not exclude the testimony of Salter. The exclusion was to Salter testifying to what Corey told her as it was hearsay. The State argues that since Salter had twenty years of providing treatment and therapy to people, she should have been permitted to testify as to what Corey told her as an

exception to the hearsay rule, specifically statements made for the purpose of medical treatment or diagnosis admitted pursuant to Evid.R. 803(4). This court does not dispute that Salter is an expert or that she has previously provided medical treatment or therapy. However, Evidence Rule 803(4) requires that the statements be made for the *purposes* of medical diagnosis or treatment and meeting certain criteria to be admissible. "Such statements are deemed to be trustworthy and admissible because 'the effectiveness of the treatment depends upon the accuracy of information given to the physician [so] the declarant is motivated to tell the truth.'" *State v. Jones*, 2015-Ohio-4116, 43 N.E.2d 833, ¶ 71 (2d Dist.) (quoting State v. Brewer, 6th Dist. Erie No. E–01–053, 2003-Ohio-3423, 2003 WL 21489419, ¶ 28, citing State v. Eastham, 39 Ohio St.3d 307, 312, 530 N.E.2d 409 (1988)). The fact that an expert makes a diagnosis does not automatically make the statements admissible if they were not made for the purpose of that. The Supreme Court of Ohio has held that the salient inquiry is whether the statements are made for the *purpose* of diagnosis and treatment rather than some other purpose. *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 47. Statements made for the purpose of investigation rather than medical treatment or diagnosis are not admissible pursuant to Evid.R. 803(4). *State v. Griffith*, 11th Dist. Trumbull No. 2001-T-0136, 2003-Ohio-6980, ¶ 60.

**{¶12}** The State argues that the evidence is admissible even if it is for the purpose of investigation and testimony and cites to *State v. Edinger*, 10th Dist.

Franklin No. 05AP-31, 2006-Ohio-1527, as support for its argument. However, the *Edinger* court actually held the opposite. In *Edinger*, the issue was whether a social worker could testify as to what a child victim told her at the hospital. The appellate court allowed the testimony for the following reasons.

> **[T]he social worker testified that the interview with the child was solely for the purposes of medical treatment and diagnosis. In the present case, the role of the social worker did not involve reporting to the police and did not involve decisions to remove the child from the home. The stated function of the social worker was specifically for medical treatment and diagnosis. While it is true that the police were permitted to observe the interview by way of closed circuit television, the police did not contact the social worker to set up the interview as happened in the *Woods* case, nor was the child aware of their presence.**

*Edinger* at ¶ 63. The court distinguished two other cases in which the testimony was not permitted. In *State v. Chappelle*, the testimony of the social worker was not permitted because her function at the time of the interview was investigatory, not to determine if medical diagnosis and treatment were necessary, however it was not excluded because it was deemed harmless. *Chappelle*, 97 Ohio App.3d 515 (8th Dist. 1994). In *State v. Woods*, the testimony of the social worker was excluded as not being for the purpose of medical treatment or diagnosis, but only tangentially related to that purpose. *Woods*, 8th Dist. Cuyahoga No. 82789, 2004-Ohio-2700. Thus, the issue is whether the statements made to Salter were made for the purpose of medical diagnosis or treatment or for another purpose.

{¶13} Salter testified that at the time of the trial she was working for the Department of Corrections in Wisconsin assessing violent offenders. Tr. 1433. She also conducted trainings on child abuse and testifies in court as an expert witness related to child abuse. Tr. 1434. Salter testified that she was hired by the State in this case to "evaluate Corey Breininger in terms of this case and any mental health issues that would affect the case." Tr. 1437-38, 1515. Thus, she was working as an agent of the state for the purpose of determining issues with the case. Salter testified that she had diagnosed Corey with Post Traumatic Stress Disorder. Tr. 1466. However, on cross-examination, she testified that she does not actually do therapy or treat people, although she used to do so. Tr. 1502. Salter testified that she had not been treating people since 1999. Tr. 1502. Her specialty is research and training concerning sexual abuse and violent crimes. Tr. 1505. Her purpose in interviewing Corey was to help with the investigation of the case, not to provide medical treatment or a diagnosis for medical reasons. Salter testified that her task was to evaluate the previous disclosures and she was not concerned about suggestibility. Tr. 1445. Moreover, Salter testified that this case and her interview were "forensic" in nature. Tr. 1439, 1556. "Forensic" is defined as "[o]f, relating to, or involving the scientific methods used for investigating crimes."[1] Black's Law Dictionary 764 (10th Ed.2014). This indicates the purpose of the interview was to aid the criminal

---

[1] There are three other definitions of "forensic" found in Black's Law Dictionary, however they are irrelevant to this case.

investigation, not for the purpose of providing medical treatment or a diagnosis for medical reasons. Thus, any testimony as to what Corey stated is not admissible as a hearsay exception under Evidence Rule 803(4). Again, this does not mean that Salter cannot testify to her conclusions based upon what Corey told her and what she learned from the records. She just cannot testify to what Corey said or vouch for his veracity.

{¶14} The State also takes issue with the statement of this court that "the State was hoping that the jury would take the statements as fact and rely on them to convict" and claims that this court substituted its judgment for that of the jury. At the completion of Salter's testimony, the State represented to the trial court that it had no more witnesses and Corey had not testified. The next day, the State again indicated that it had no more evidence to present other than to address the admissibility of exhibits. Discussions were had between the attorneys and the trial court about the admissibility of the exhibits without Corey's testimony and the trial court told the State that absent that testimony, the evidence going to the jury would be "very, very limited". Tr. 1733. It was after this statement that the State requested that Corey be allowed to testify and the trial court agreed. Additionally, our ruling addressed an issue of law, not fact. Thus, we did not substitute our judgment for that of the jury as jurors do not rule on admissibility of evidence. The claims made on this issue in the motion for reconsideration do not raise any new issue nor point

to an obvious error. As noted above, motions for reconsideration are not the proper vehicle for addressing a difference of opinion with the logic of the court.

{¶15} The fifth claim raised by the State is that this court focused on a book that was not admitted into evidence. A review of the opinion indicates that the statements questioned by the State were taken from the testimony of Dr. Esplin who did a comparison between the book and Corey's story. This testimony was not stricken and was thus part of the record. If the State has an issue with this testimony, then the matter should be addressed during the next trial. As this court did not reach the question of the manifest weight of the judgment due to other errors, this testimony was not considered in reaching its conclusion.

{¶16} Next, the State claims that this court erred by finding error in the testimony of Beck when she testified to the hearsay statements of Corey. The State in its motion for reconsideration argues that the statements were not made for the truth of the matter asserted. Although this argument was briefly raised by the State in its appellate brief, it is arguable that it was not the position of the State at trial and cannot be raised for the first time on appeal. *State v. Croft*, 3d Dist. Auglaize No. 2-15-11, 2016-Ohio-449, ¶ 8. *See also, State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, 964 N.E.2d 442 (6th Dist.) (holding that the State may not present a theory or add to a theory for the admission of evidence on appeal that was not presented to the trial court). If that had been the intent of the State, Beck could have testified as to what she did without repeating the statements of Corey by merely

testifying that based upon what Corey told her, she took the actions she did.

Additionally, "[w]here the facts to be proven at trial and the substantive content of

an out-of-court statement coincide, it can be presumed that the proponent is offering

the statement for its truth." *Richcreek, supra* at ¶ 23. However, we will give the

State the benefit of the doubt and address its arguments anyway.

{¶17} Contrary to the State's argument in its motion, the testimony of Beck

regarding the statements of Corey was subject to objection.

**[Beck]: \* \* \* And so he come over and stood by me, and he said –**

**Mr. Crates: Objection, hearsay.**

**The Court: Sustained.**

**Q. What was his – when you started to have a conversation with him, what was his demeanor? What was his – how did – as that conversation unfolded, how did he behave? What was his demeanor then? In other words, did he – was he –**

**\* \* \***

**A. He – he was in a good mood.**

**Q. Okay. As that conversation went on, did his disposition change?**

**A. Yes, it did**

**Q. And in what respects did it change?**

**A. Because he informed me that he had –**

**Mr. Crates: Objection, hearsay.**

**Q. What was his disposition like first? How was he acting?**

**Mr. Crates:  Asked and answered.**

**The Court:  Overruled.  You can answer.  You can describe his demeanor.  You can't repeat what he told you.**

**A.  He was very – he was smiling when he saw me and said hello, how are you doing.**

**Q.  And then you said, in answer to my prior question, that as your conversation went on, his disposition changed?**

**A.  Yes.**

**Q.  Okay.  And in what way did it change?  How did he act, and what was he doing at that point?  Before we talk about, or whether we talk about what he said to you, how was he acting?  What was his –**

**A.  He was crying.**

**Q.  – disposition?  Okay.  So he – he was emotional?**

**A.  Very.**

**Q.  Okay.  Why did, from your perception of observing him at that point, why was he emotional?**

**A.  Because he was sharing –**

**Mr. Crates:  Objection, hearsay.**

**The Court:  Sustained.**

**Q.  Based upon his emotional behavior, was he telling you something important about his life?**

**Mr. Crates:  Objection, hearsay.**

-17-

Tr. 591-594.  An off the record conference was then held between the trial court and the attorneys.  At no time during this conversation regarding statements by Corey being hearsay did the State indicate that the statements were not being offered for the truth of the matter asserted.  The State continued to present evidence that Corey was upset and emotional.  Soon after the conference, the following testimony occurred.

> **A.   After we – we stopped at the end of the fence, and he was within feet of me, and he looked at me and said that –**
>
> **Mr. Crates:  Objection, hearsay.**
>
> **Mr. Murray:  Again, Your Honor, we would suggest that there is a hearsay exception here.**

Tr. 596.  At this point in time, the State implicitly admitted that the statements were hearsay, but argued that they were subject to an exception.  After repeated objections, including a request for a continuing objection, to the State's questions asking Beck what Corey told her, the State argued that Beck should be allowed to testify to the spontaneous disclosures that were made to her because the foundation for the hearsay exception for it had been laid.  Tr. 599-600, 612.  The only foundation that had been discussed was that Corey was very upset and that these statements were excited utterances.  Later in the testimony after Beck stated that Corey had calmed down, the defense objected to another statement made by Corey to Beck.  Tr. 606.  The testimony was allowed after the State argued that Corey was "still under the influence of this emotion" at the time of the later statements.  Tr.

607. Although the State never specifically said on the record that the exception was based upon an excited utterance at the time of the testimony, the trial court later indicated that those statements were "admitted on the State's theory that those [statements] were excited utterances." Tr. 1726. The State did not contradict this statement.

{¶18} The trial court did make a statement that the statements could come in as prior consistent statements made by Corey to rebut an express or implied charge of recent fabrication or improper influence or motive. While that might be allowed if Corey had testified, that had not occurred at the time Beck testified, and there were no prior consistent statements made under oath and subject to cross-examination to rebut. The State relies upon 801(D)(1)(b) in its motion, but it only applies if the declarant has testified at trial and has testified consistently with a prior statement. Corey had not testified at that point during the trial, so there were no consistencies in his testimony.

{¶19} Additionally, the rule does not automatically mean that all prior consistent statements are admissible.

> **The rule contains a timing component for prior statements in relation to a charge of "improper motive." That is, only prior consistent statements made before the alleged motive to fabricate arose are admissible. The issue is not when the charge was made, but when the improper motive arose. If "the facts giving rise to the motive to falsify existed before the disputed consistent statements," then Evid.R. 801(D)(1)(b) does not apply and the statements are inadmissible.**

**{¶20}** *State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, 964 N.E.2d 442, ¶ 59 (6th Dist.). "Obviously, the relevancy of many such statements would be suspect-an improbable story is not made more probable simply because it is repeated." *Motorists Mut. Ins. Co. v. Vance*, 21 Ohio App.3d 205, 207, 486 N.E.2d 1206, (10th Dist. 1985). The issue of the excited utterance exception, along with the State's argument that the testimony was harmless because Corey eventually testified, was fully addressed in the original opinion. See *Hawkey, supra* at ¶ 61-69. In order to find that the admission of hearsay evidence was not prejudicial, "the evidence in favor of conviction, absent the hearsay, must be so overwhelming that the admission of those statements was harmless beyond a reasonable doubt." *State v. Kidder,* 32 Ohio St.3d 279, 284, 513 N.E.2d 311 (1987). That was not the case here.

**{¶21}** Additionally, the State argues that we made an obvious error by omitting any mention of the supposed confession made by Hawkey to her current husband in a recorded jail conversation. Upon reviewing the conversation, we cannot tell whether Hawkey states "I did it", "I didn't", or "I get it." Therefore, this piece of "evidence" is not so overwhelmingly incriminating that we committed error by omitting it from our analysis. We reiterate that nearly all of the incriminating evidence as to the child endangerment charges, which was the predicate for the murder charge, comes back to Corey's testimony. The only physical evidence of child abuse was the scar above Corey's penis. Some of the State's testimony

regarding child abuse was contradicted by other witnesses, including those for the State. When nearly all the evidence is being supported by one person's testimony and where that testimony is bolstered by impermissible hearsay, the ultimate conviction cannot be said to not be tainted. Therefore, reversal is required.

{¶22} The State has neither presented an obvious error nor raised an issue not considered by this court. Instead, the State merely takes issue with our conclusions, which is a not ground for reconsideration.

{¶23} The seventh claim made by the State is that this court substituted its judgment for that of the jury. This does not raise any issue appropriate for reconsideration as it is merely a difference of opinion. This court did not make any findings of fact in its opinion. The decision of this court was based upon questions of law, not ones of fact. The only questions of fact that were raised on appeal went to the assignment of error relating to the manifest weight of the evidence. Having found errors in the trial procedure, this court did not address the manifest weight of the evidence. *Hawkey, supra* at ¶ 84. Thus, this court did not substitute its judgment for that of the jury.

{¶24} Finally, the State claims that our prior opinion was inconsistent because we determined that the evidence was sufficient to support the convictions, yet we ordered a new trial. For the clarification of the State, this court notes that when prejudicial errors are found in the procedure, the remedy is a new trial. However, this finding does not mean that this court need not address the sufficiency

of the evidence. *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284. The appellate court must still address the sufficiency of the evidence because if the evidence is not sufficient to support the convictions, the remedy is dismissal of the charges and a new trial would be barred by double jeopardy. *Id*. at ¶14-15. However, retrial is not barred if the evidence presented at the trial is sufficient to support a conviction even though the conviction is reversed due to trial errors. *Id*. at ¶ 16. This court found there were errors that called for a new trial. However, the court also found that based upon the evidence presented in the first trial and viewing that evidence in a light most favorable to the State, the evidence was not insufficient to support the convictions. The statement that the judgment was affirmed in part and reversed in part merely reflected our rulings on the assignments of error. The sufficiency challenge was overruled, so we used the term "affirmed." However, we sustained Hawkey's hearsay challenges and the expert witness challenges, so we used the term "reversed" for that portion. Upon reflection, we acknowledge that the appropriate phrasing to use was just that the judgment was reversed, as all of Hawkey's convictions were reversed. Thus, the State has the opportunity to try the case again rather than have the charges dismissed and the defendant released.

{¶25} Having reviewed the claims made by the State, our opinion, and the record, the Court finds that the application fails to set forth an obvious error in the decision or raise any issues that were not properly considered in the first instance. The claims merely present a difference in opinion as to the conclusions reached and

the logic of this court. Accordingly, the application for reconsideration should be denied and clarification has been provided as set forth above.

**{¶26}** Furthermore, in regard to the motion to certify a conflict, the Court finds that there is no true and actual conflict on a rule of law between the decision in the instant case and the decision in *State v. Edinger*, 10th Dist. Franklin No. 05AP-31, 2006-Ohio-1527. The analysis set forth above shows that the two decisions are factually distinguishable and not in conflict on the pertinent rule of law. See *Whitelock v. Gilbane Bldg. Co.* (1993), 66 Ohio St.3d 594. Accordingly, the motion to certify is likewise without merit and should be denied.

**{¶27}** It is therefore **ORDERED** that Appellee's application for reconsideration and motion to certify a conflict be, and the same hereby are, overruled.

/S/   WILLAMOWSKI
JUDGE

/S/   ROGERS
JUDGE

PRESTON, J., Dissents as to Motion for Reconsideration
JUDGE

DATED:   August 15, 2016

/hls